# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 50311 | **DATE** | 10/12/2001 |
| **CASE TITLE** | | RUSSEY vs. MASSANARI | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   For the reasons stated on the attached, it is the Magistrate's Report and Recommendation that Plaintiff's motion for summary judgment be denied. It is further recommended that Defendant's motion for summary judgment be granted. Enter attached Report and Recommendation. Parties are given ten days from service of this order, as calculated under Rule 6, to appeal to Judge Philip G. Reinhard, pursuant to Rule 72 of the Federal Rules of Civil Procedure.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | OCT 12 2001 | 24 |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | CLERK | 10/12/2001 | |
| | | | 10 OCT 12 PM 2:15 | date mailed notice | |
| gg | courtroom deputy's initials | | | gg | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

FILED-WD
OCT 12 PM 12: 16
CLERK
U.S. DISTRICT COURT

DOCKETED
OCT 12 2001

| | | |
|---|---|---|
| GEORGE S. RUSSEY | ) | |
| | ) | |
| Plaintiff, | ) | Case No.  00 C 50311 |
| | ) | |
| v. | ) | Philip G. Reinhard |
| | ) | P. Michael Mahoney |
| LARRY G. MASSANARI, | ) | |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

Plaintiff, (Plaintiff), seeks judicial review of the final decision of the Commissioner of the

Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The

Commissioner's final decision denied Plaintiff's application for Supplemental Security Income

(SSI) pursuant to the Social Security Act (the Act). 42 U.S.C. §1382(c). This matter is before the

Magistrate Judge for Report and Recommendation pursuant to Rule 72(b) and 28 U.S.C.

§636(b)(1)(B).

## I.    BACKGROUND

Plaintiff initially applied for SSI benefits on February 18, 1994, and November 4, 1994.

(Tr. 139-142).  Plaintiff's application was denied on June 9, 1994, and December 7, 1994. (Tr.

169-170).  On January 23, 1995, Plaintiff filed his Request for Reconsideration. (Tr. 179-180).

Plaintiff's request was denied on April 17, 1995. (Tr. 188-190).  Plaintiff subsequently requested a

hearing before an Administrative Law Judge on June 1, 1996. (Tr. 191-194).  Plaintiff's hearing

was initially scheduled for July 17, 1996. (Tr. 32-36).  At that time, the ALJ decided to postpone

the hearing to allow Plaintiff to obtain counsel. (Tr. 35). Plaintiff was then scheduled to appear before the ALJ on September 23, 1996. (Tr. 37-41). The ALJ again postponed the hearing to allow Plaintiff to continue his attempts to obtain counsel. (Tr. 40). Plaintiff then appeared before the ALJ on December 5, 1996, again without counsel. (Tr. 42-51). Plaintiff informed the ALJ that he had still not been able to obtain counsel and that he wished to proceed without counsel. (Tr. 44-45). After some discussion with the ALJ, Plaintiff decided he would again try to find counsel and the hearing was again postponed. (Tr. 42-51). On February 11, 1997, Plaintiff appeared before the ALJ. (Tr. 52-90). At that time, Plaintiff was represented by counsel, however, during the course of the hearing it was discovered that Plaintiff was alleging short-term memory problems that had not been previously alleged. (Tr. 78-90). In response, the ALJ remanded Plaintiff's claim back to the state agency so that the record as to Plaintiff's mental impairment could be fully developed. (Tr. 88-90). On January 28, 1998, Plaintiff again appeared, with counsel, before the ALJ. (Tr. 91-115). Plaintiff's attorney, advised the ALJ that a psychological evaluation had been performed on Plaintiff and that the resulting diagnosis was of a personality disorder. (Tr. 105). After some discussion, the ALJ determined that additional evaluation was needed and Plaintiff was referred for a psychiatric consultative exam and the hearing was again postponed. (Tr. 114-115, 263-264). On August 28, 1998, Plaintiff appeared, with counsel, before the ALJ for the remainder of his hearing. (Tr. 116-132). At that final hearing, vocational expert, Cheryl Hoiseth, testified. (Tr. 116-134).

## II.    FACTS

Plaintiff was born on February 22, 1957, and was forty-two years old at the time of the ALJ's decision. (Tr. 25, 139). Plaintiff completed his education through the eighth grade and has primarily worked as a machine operator and laborer. (Tr. 25, 147). At the February 11, 1997,

2

hearing Plaintiff claimed that he was disabled due to osteoarthritis, disc problems in the lumbar spine and diabetes with neuropathy and vision impairment. (Tr. 54-55). Plaintiff testified that he last worked on September 15, 1984, and that he was terminated at that time when his efficiency fell due to carpal tunnel in his hands. (Tr. 63-64). Plaintiff stated that he is in pain twenty-four hours a day and he is only able to walk about three blocks and is in pain the whole way. (Tr. 65). Plaintiff also testified that he has difficulty with standing and sitting for any length of time due to the pain. (Tr. 66). As to his daily activities, Plaintiff testified that he currently lives with a woman, that he sleeps on and off through the day, that he bathes and dresses himself but on some days cannot manage, that he does not cook for himself, except to boil hot-dogs, he rarely does his own shopping and that he does not drive. (Tr. 68-72). Plaintiff testified that he does take public transportation but that sometimes he cannot get on the bus because he is unable to lift his legs as high as the step. (Tr. 72). As to social activities, Plaintiff testified that he occasionally visits his mother but that mostly he lays around inside and doesn't go anywhere except to the doctor's office. (Tr. 72). Plaintiff stated that he does not use a back brace because his doctor advised him that it wouldn't provide any relief and that Plaintiff does occasionally use a cane but that it causes problems with his hands. (Tr. 74). Plaintiff claimed that he does have vision problems as a result of his diabetes and that he gets blurred vision and headaches. (Tr. 76). Plaintiff asserted that he did take medication for his diabetes as recommended by his doctor but that he could not always follow the recommended diet because he receives food stamps and there are some foods he cannot afford. (Tr. 68-69). Plaintiff also claimed that he suffered from short-term memory problems, that he forgets what he is saying mid-conversation, sometimes forgets where he is going and that when his pain is severe he cannot "think straight". (Tr. 77-79). Plaintiff testified that he smokes a little and

drinks a little beer but is not a heavy drinker. (Tr. 84). Plaintiff stated that he has tried to do some work such as raking leaves and mowing the lawn but that he has been unable to due to pain in his hands. (Tr. 85).

Vocational expert, Cheryl Hoiseth, was examined as to Plaintiff's vocational abilities. (Tr. 119-132). The ALJ presented Ms. Hoiseth with the following hypothetical individual: forty-one years old, eighth grade education, no past relevant work, can perform medium level exertional work with the following exceptions: can climb ramps and stairs frequently, can climb ladders, ropes and scaffolds occasionally, can balance frequently, can stoop and crouch occasionally, can kneel frequently, cannot perform fine fingering tasks and does not have good interpersonal skills or good individual judgment. (Tr. 120-122). Ms. Hoiseth was questioned whether any unskilled jobs existed that such a person would be capable of performing. (Tr. 122). Ms. Hoiseth responded that an individual with those vocational characteristics would be capable of performing the jobs of hand packager and kitchen helper. (Tr. 123-125). Ms. Hoiseth testified that 13,200 hand packaging and kitchen helper jobs existed in the Northern Illinois area. (Tr. 123-125).

## III.   **MEDICAL HISTORY**

Plaintiff's medical records indicate that he was treated for a neck and back injury in 1982. (Tr. 198-199). Those records state that Plaintiff was injured in an auto accident on February 26, 1982, and that he began experiencing numbness and pain in the neck, low back and left leg. (Tr. 199). Plaintiff was seen on March 23, 1982, and it was noted that Plaintiff had full range of motion (ROM) in his neck and back, that he could flex to within three inches of touching the floor, his neurologic exam was normal and there was no evidence of spasm. (Tr. 199). Notes from April 13, 1982, indicate marked voluntary guarding and histrionic responses. (Tr. 199). On May 17,

1982, it was noted that Plaintiff's neck was improved but that he was complaining of pain and swelling in his left foot. (Tr. 199). The record also notes that X-Rays of the left foot and ankle were negative. (Tr. 199).

In 1984, Plaintiff was treated for pain in both of his wrists. (Tr. 197-198). Treatment notes indicate that Plaintiff was seen on August 23, 1984, complaining of pain in both wrists. (Tr. 198). Plaintiff was diagnosed with tenosynovitis and received steroid injections, a prescription for Vicodin and wrist splints. (Tr. 198). On September 6, 1984, Plaintiff reported that his wrist pain continued and that he had been fired from his job. (Tr. 198). On October 25, 1984, Plaintiff was again seen for wrist pain, the treating physician noted some hyperemia in both hands and increased sweating but no tenderness with palpation when Plaintiff was distracted. (Tr. 197). Plaintiff was diagnosed with synovitis and given a prescription for Rufen. (Tr. 197). On December 6, 1984, Plaintiff's physician noted that Plaintiff's symptoms were likely aggravated by his poor reaction to pain and that Plaintiff should have improved in that "his original problem was simply synovitis". (Tr. 197).

Progress notes from Dr. Ramchandani, Plaintiff's treating physician, indicate that Plaintiff suffers from diabetes. (Tr. 201-203).[1] Plaintiff was seen on August 17, 1993, for a blood sugar follow-up and it was noted that he complained of joint pains in his ankles and knees. (Tr. 203). Plaintiff was seen by Dr. Ramchandani on December 3, 1993, complaining of blurred vision and stated he could not follow the dietary restrictions due to financial considerations. (Tr. 203). On December 10, 1993, Dr. Ranchandani noted that Plaintiff suffered from poorly controlled diabetes

---

[1] The records also include several pages of illegible treatment notes. (Tr. 204-206, 209-210).

5

mellitus. (Tr. 202). On December 17, 1993, Plaintiff was treated for pharyngitis. (Tr. 202). On December 23, 1993, Plaintiff was seen for a follow-up on his diabetes and stated he was doing fine otherwise and doing much better with the increased dose of Diabeta. (Tr. 202). X-Rays taken on March 10, 1992, of Plaintiff's left knee and ankle indicate intact bones and joints with no effusion, soft tissue masses or calcifications. (Tr. 208). A March 16, 1995, X-Ray of the left knee demonstrates that the left knee is intact with no effusuion, soft tissue masses or calcifications. (Tr. 220). On February 27, 2995, Dr. Ramchandani reported to the Illinois Bureau of Disability Determination Services through a telephone conversation that Plaintiff suffers from diabetes mellitus, diabetic retinopathy, neuropathy and osteoarthritis of multiple joints. (Tr. 219). Dr. Ramchandani reported that Plaintiff did have some swelling in his hands and knees, intravertebral disc disease of L5-S1 and osteoarthritis, as demonstrated by a 1991 lumbosacral X-Ray, limited ROM in the lumosacral spine and knees and decreased sensation in the lower extremities due to diabetes. (Tr. 219). Finally, Dr. Ramchandani noted that Plaintiff occasionally had headaches from uncontrolled diabetes and that Plaintiff's mental status is normal with no mood swings or mental problems. (Tr. 219). On July 29, 2995, Plaintiff was seen by Dr. Ramchandani and complained of a low back ache spreading to his left extremity leaving him unable to walk. (Tr. 245).

On April 8, 1997, Dr. Ramchandani prepared a disability evaluation of Plaintiff for the Illinois Department of Rehabilitation Services. (Tr. 283-284). Dr. Ramchandani noted that Plainitff presented on April 8, 1997, with complaints of backache since 1982 with sharp, burning pain in the lumbar spine that is constant and radiates to the lower extremities resulting in the necessity of a cane to walk. (Tr. 283). Plaintiff also reported pain in his neck, hands, knees and left foot. (Tr. 283). Dr. Ramchandani reported that Plaintiff was alert and oriented and not in any

obvious physical pain. (Tr. 284). Dr. Ramchandani noted that Plaintiff's gait was normal and that he was able to walk on his heels and toes and get on the exam table and dress and undress himself unassisted. (Tr. 284). Plaintiff was able to pick up a pen and a penny from the table somewhat clumsily. (Tr. 284). Dr. Ramchandani found no inflamation of the cervical spine, lumbar spine or knees. (Tr. 284). Plaintiff's speech, memory and cranial nerves were intact. (Tr. 284). Dr. Ramchandani did note some decreased sensation to touch and pinprick below the knees. (Tr. 284). Plaintiff did have some inflammation in the small joints of both hands and Pes Planus[2] deformity in both feet. (Tr. 284). Dr. Ramchandani found that Plaintiff suffered from osteoarthritis of multiple joints, possible discogenic disease of the lumbar spine, diabetes mellitus, peripheral neuropathy secondary to diabetes mellitus and Pes Planus deformity of both feet. (Tr. 285). X-Rays from April 8, 1997, indicate no foreign bodies or soft tissue calcifications of the right hand or left knee. (Tr. 286-287). X-Rays of the lumbar spine indicate the presence of intervertebral disc disease and osteoarthritis at the L5-S1 level. (Tr. 288). The most recent treatment notes, from May 21, 1998, indicate (to the extent that they are legible) that Plaintiff has low back pain and bilateral carpal tunnel syndrome. (Tr. 346). Dr. Ramchandani noted that Plaintiff's neck was supple with some stiffness in the right side. (Tr. 346). Also, Dr. Ramchandani did note that Plaintiff was walking with a limp. (Tr. 346).

Cervical X-Rays ordered by Dr. James Bane and performed on September 16, 1994, indicate an unremarkable cervical spine except for some endplate spurring at the C5-C6 level. (Tr. 211). On September 8, 1994, Dr. Bane examined Plaintiff and found some stiffness in his neck

---

[2] A condition in which the longitudinal arch is broken down, the entire sole touching the ground. Steadman's Medical Dictionary1357 (27th ed. 2000).

7

with full ROM and no adenopathy, point tenderness or masses. (Tr. 215). Plaintiff was seen by Dr. Bane on October 27, 1994. (Tr. 212). Dr. Banes' notes indicate that Plaintiff was able to get on the exam table without difficulty, there was no synovial thickening or tenderness, complete range of motion in fingers wrists and elbows, some limitation in the right shoulder, Plaintiff was able to flex his back to 75 degrees, flex his quadriceps without a great deal of difficulty, flex his knees completely and his feet and ankles were non-tender with full ROM. (Tr. 212). Dr. Banes found Plaintiff had a lot of pain but there were no objective findings and he urged Plaintiff to continue exercising and look for job opportunities that do not require manual lifting. (Tr. 212).

A RFC assessment was completed on April 28, 1997, by Dr. Rachel Gotancet, MD. (Tr. 289-296). Dr. Gotancet found that Plaintiff was able to lift fifty pounds occasionally and twenty-five pounds frequently. (Tr. 290). Dr. Gotancet also found that Plaintiff was able to stand or sit for six hours in an eight hour workday. (Tr. 290). Dr. Gotancet found Plaintiff's low back problems limited his ability to climb, stoop and crouch. (Tr. 291). Plaintiff was also found to be limited in his abilities to perform fine manipulations. (Tr. 292). No visual, communicative or environmental limitations were noted. (Tr. 292-293).

Mental Health Information

Plaintiff was seen by John Peggau, Psy.D. on March 26, 1997, for a psychological exam. (Tr. 280-282). Dr. Peggau noted that Plaintiff was rude, curt and inappropriate while scheduling the appointment. (Tr. 280). Dr. Peggau noted that Plaintiff was a poor historian and it took a great deal of time to get him to respond appropriately to several questions. (Tr. 280). Dr. Peggau reported that Plaintiff was vague in his responses and basically refused to provide any specific information regarding his daily activities. (Tr. 280). Plaintiff's speech was noted to be vague and

barely relevant. (Tr. 281). Dr. Peggau found Plaintiff to be oriented to time, able to recall seven digits forward and three backward, stated that "Bill Dole" was the current president and could not name any previous presidents. (Tr. 281). Plaintiff informed Dr. Peggau that he had never been in prison but had been in jail one or two times for controlled substances violations. (Tr. 281). Dr. Peggau diagnosed Plaintiff with an Axis II characterological disorder with antisocial features. (Tr. 281).

On May 19, 1997, Dr. Hudspeth, Psy. D. completed a Psychiatric Review Technique Form (PRTF) of Plaintiff. (Tr. 297). Dr. Hudspeth found no evidence of an organic mental disorder, schizophrenic, paranoid or other psychotic disorder, affective disorder, mental retardation or autism, anxiety related disorders, somatoform disorders or substance addiction disorders. (Tr. 297-303). Dr. Hudspeth did find that Plaintiff exhibited maladaptive personality traits causing either significant impairment in social or occupational functioning or subjective distress evidenced by pathologically inappropriate suspiciousness or hostility and intense and unstable interpersonal relationships and impulsive and damaging behavior. (Tr. 302). According to Dr. Hudspeth, Plaintiff is moderately limited in his ability to maintain social functioning and slightly limited in his activities of daily living with seldom deficiencies of concentration, persistence or pace. (Tr. 304). Dr. Hudspeth also completed a mental RFC assessment on Plaintiff on May 19, 1997. (Tr. 306-309). Dr. Hudspeth found that Plaintiff is moderately limited in his ability to understand and remember detailed directions, carry out detailed directions and in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes and that he is markedly limited in his ability to interact appropriately with the general public. (Tr. 306-307). Dr. Hudspeth noted that Plaintiff does appear to have some characterological issues and has some

9

difficulties at times relating and dealing with people. (Tr. 309).

On March 3, 1998, Plaintiff was seen by Dr. Delsie Gavali, MD for a psychiatric exam. (Tr. 337-339). Dr. Gavali noted that Plaintiff has been taking pain medication since 1984. (Tr. 337). Dr. Gavali wrote a social history of Plaintiff and indicated that Plaintiff was born in Arkansas and moved to Rockford, Illinois when he was one. (Tr. 337). Plaintiff was raised by his mother along with his three siblings. (Tr. 337). Plaintiff stated that he did well in school until the ninth grade and that he started working at age 12. (Tr. 337). Dr. Gavali noted that Plaintiff was oriented to time and place but could not do serial sevens. (Tr. 338). Plaintiff maintained eye contact and was cooperative. (Tr. 338). Plaintiff was slow to answer questions and claimed it was due to the medicine he was taking. (Tr. 338). Dr. Gavali determined that Plaintiff suffered from a somatization disorder and dysthymic disorder as well as a learning disability. (Tr. 338). Dr. Gavali noted the discrepancy between her report and Dr. Peggau's with respect to Plaintiff's level of cooperation. (Tr. 339). Dr. Gavali concluded that Plaintiff was low functioning, suffered from a personality disorder and would not be able to manage his own money. (Tr. 339).

On March, 22, 1998, the ALJ completed a PRTF on Plaintiff. (Tr. 27-29). The ALJ determined that Plaintiff had a personality disorder characterized by pathologically inappropriate suspiciousness or hostility. (Tr. 27). The ALJ found that Plaintiff's mental impairment resulted in slight limitations in the activities of daily living and moderate limitations in social functioning. (Tr. 28).

## IV.  **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the

10

court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental

11

implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F.Supp. 1377, 1384 (N.D.Ill. 1995).

## V.    **FRAMEWORK FOR DECISION**

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[3] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the

---

[3]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[4] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically

---

[4]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work

14

exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on March 22, 1998. (Tr. 24).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and forty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. Therefore, it is the magistrate's Report and Recommendation that the ALJ's determination as to Step One of the Analysis be affirmed.

B. Step Two:  Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffers from insulin dependent diabetes mellitus with some mild peripheral neuropathy, mild osteoarthritis and disc disease of the hands, knees, cervical spine at C5-6 and lumbar spine at L5-S1, pes planus deformity of both feet and a personality disorder. (Tr. 24)

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to

15

disturb it. It is the magistrate's Report and Recommendation that the ALJ's finding as to Step Two of the Analysis be affirmed.

C.    Step Three: Does claimant's impairment meet or medically equal an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 24). The ALJ found that Plaintiff's allegations of disabling symptoms and limitations were not fully credible. (Tr. 25).

Substantial evidence exists to support the ALJ's finding and the court finds no reason to disturb it. Therefore, it is the magistrate's Report and Recommendation that the ALJ's determination as to Step Three of the Analysis be affirmed.

D.    Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In this case, the ALJ determined that Plaintiff has no past relevant work. That decision is not challenged by either party and this court finds no reason to disturb it. Therefore, it is the magistrate's Report and Recommendation that the ALJ's decision as to Step Four be affirmed.

E.    Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five The ALJ determined that although Plaintiff's Residual Functional Capacity did not allow him to perform the full range of medium work, there existed a significant number of jobs in the national economy that he can perform. (Tr. 25). In reaching this conclusion the ALJ noted that the objective findings in this case failed to provide strong support for Plaintiff's

16

allegations of disabling symptoms and limitations. (Tr. 17). Plaintiff's objection to the decision of the ALJ, as raised in his Memorandum in Support of his Motion for Summary Judgment, is that the ALJ failed to fully develop the medical evidence for Plaintiff. (Plaintiff's Memorandum in Support at 2-3, filed 5/24/2001). Plaintiff notes that there appear to be many treatment records, particularly from Dr. Ramchandani, not included in the record. (Plaintiff's Memorandum at 2, filed 5/24/2001). Plaintiff asserts that while the fact that a claimant is represented by counsel generally permits and ALJ to assume that the strongest case is being made, "the presence of counsel should not obviate every degree of inadequacy of the record in support of a claim". (Plaintiff's Memorandum in Support at 3, filed 5/24/2001). Plaintiff asserts that the ALJ still has a duty to scrupulously and conscientiously inquire of and explore for all the relevant facts. (Plaintiff's Memorandum at 3, filed 5/24.2001).

This court declines to grant Plaintiff's request that this case be remanded for further evidentiary hearings and to seek additional records from Dr. Ramchandani. Plaintiff has provided no evidence that there is any likelihood that additional treatment records exist. As noted in the procedural history portion of this opinion, Plaintiff was given several opportunities to obtain counsel and seek consultative exams in order to prepare for the hearing. The evidence that was provided to the ALJ constitutes substantial evidence to support the ALJ's determination that Plaintiff is not disabled. Now Plaintiff seeks a remand for additional evidentiary hearings without providing any information to this court to indicate that there is evidence that was not presented to the ALJ.

The Social Security Administration (SSA) does have a duty to make reasonable efforts to obtain all medical evidence. 20 C.F.R. §416.912(d). Plaintiff has provided no evidence that the

SSA did not make reasonable efforts to obtain his medical records. A review of the records demonstrates that Plaintiff provided contact information for his treating physicians and records from those physicians were produced to the SSA at its request. In addition, Plaintiff was referred to a psychologist, psychiatrist and physician for consultative exams. It is clear from the evidence presented that all reasonable efforts were made to obtain medical evidence on Plaintiff's behalf.

The ALJ noted that the evidence with respect to Plaintiff's musculoskeletal complaints demonstrated only mild X-Ray findings in the C5-6 and L5-S1 levels. (Tr. 17). Plaintiff's treatment records did not indicate a limited ROM in his neck, sciatica or localized muscle weakness. (Tr. 17). Further, Dr. Ramchandani's report of April 1997, indicated that Plaintiff walked unassisted with a normal gait and was able to get on and off the exam table and dress and undress without assistance. (Tr. 17). Also, Plaintiff's right hand X-Ray in April 1997 was normal and while he was clumsy, Plaintiff was able to perform gross motor functions with his hands. (Tr. 17). The ALJ noted that while Dr. Ramchandani did report some limited ROM in Plaintiff's joints, there were no reports of soft tissue swelling or inflammation. (Tr. 18).

The ALJ also noted that there was evidence of very little pathology resulting from Plaintiff's diabetic condition. (Tr. 18). Plaintiff did have decreased sensation below his knees, but there was no evidence of end organ damage or retinopathy. (Tr. 18). Plaintiff's vision was reportedly virtually normal in April 1997. (Tr. 18). As to Plaintiff's allegations of memory problems and disorientation, the ALJ noted that Plaintiff's psychological and psychiatric exams indicated that Plaintiff was alert, oriented and able to perform simple mental tasks. (Tr. 18-19).

Finally, the ALJ addressed Plaintiff's claims of disabling pain and determined that they were not credible given the lack of consistent treatment history and the apparent effectiveness of

18

Plaintiff's medications. (Tr. 19). The ALJ noted that Plaintiff initially claimed that he had no side effects from his medications and it was not until the January 28, 1998, proceeding that he claimed his medication made him feel fuzzy. (Tr. 20). The ALJ determined that Plaintiff's limited daily activities were not supported by objective medical evidence. (Tr. 20). The ALJ noted that Plaintiff had a generally unconvincing appearance and demeanor at the hearings and displayed no evidence of significant pain or discomfort. (Tr. 22). The ALJ reported that Plaintiff's exhibition of pain behavior was theatrical and that he did not begin to squirm, wince and sigh until his testimony began and that otherwise, he was observed to sit still for an hour with no indication of pain. (Tr. 22).

The ALJ determined that given the medical evidence, Plaintiff's RFC was for a limited range of medium level work. (Tr. 23). The ALJ found that Plaintiff was therefore capable of performing a significant number of jobs existing in the national economy. (Tr. 24). The ALJ was assisted by a vocational expert, Cheryl Hoiseth, to determine if an individual with Plaintiff's vocational characteristics was capable of performing work existing in significant numbers in the national economy. (Tr. 24).

The record clearly supports the ALJ's finding with respect to Plaintiff's RFC. The RFC assessment completed by Dr. Gotancet on April 28, 1997, indicated that Plaintiff is capable of lifting up to fifty pounds occasionally and twenty-five pounds frequently. (Tr. 290). Dr. Gotancet reported that Plaintiff could sit or stand for six hours of an eight hour workday and that the only significant limitations on Plaintiff's RFC are postural and manipulative. (Tr. 289-296). The objective medical evidence supports this RFC assessment. While, Dr. Ramchandani did note some limited ROM, he did not note any soft tissue swelling or inflammation. Further, X-Rays of

19

Plaintiff's joints did not indicate any abnormalities with the exception of some endplate spurring at C5-6 and some intravertebral disc disease and osteoarthritis at L5-S1. On May 19, 1997, Dr. Hudspeth completed a Mental RFC assessment of Plaintiff. (Tr. 306-309). Dr. Hudspeth noted that Plaintiff was moderately limited in his ability to understand, remember and carry out detailed instructions, and get along with peers and coworkers without distracting them or exhibiting behavioral extremes and markedly limited in his ability to interact appropriately with the general public. (Tr. 306-307). Dr. Hudspeth did not note any additional limitations with regard to Plaintiff's Mental RFC. (Tr. 306-309).

Substantial evidence exists to support the ALJ's findings at Step Five. Therefore, it is the Report and Recommendation of the magistrate that The ALJ's decision at Step Five be affirmed.

## VII. CONCLUSION

For the above reasons, it is the magistrate's Report and Recommendation that Plaintiff's motion for summary judgment be denied. It is further recommended that Defendant's motion for summary judgment be granted.

**ENTER:**

**P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
**UNITED STATES DISTRICT COURT**

**DATE:** 10/12/01